UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 17-055-DCR-6 |
| | ) | |
| V. | ) | |
| | ) | |
| SMIRNA ORTIZ, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

**I.**

This case stems from a drug distribution and money laundering conspiracy headed by Defendant Ciro Macias Martinez and his wife, Defendant Brizeida Janet Sosa.[1]  Martinez began working for the Jalisco, a new generation cartel, after meeting an individual known as "Jalisco" while in prison.  [Record No. 333, pp. 116, 128]  He initially began laundering small amounts of drug money for the cartel—approximately $3,000 per week—by depositing the money with businesses that would send it back to Mexico.  [*Id.* at 129]  But eventually his involvement in the cartel grew, and Martinez began distributing controlled substances (approximately 25 to 40 kilograms of heroin, cocaine, ecstasy, and/or methamphetamine per month), and laundering larger amounts of drug proceeds (approximately $2 million over the course of the conspiracy).  [*Id.* at 4, 7-8, 34-36, 134, 142, 147-48]

---

1 The spelling used in this Memorandum Opinion and Order is consistent with the Indictment and other documents filed in this case.  [*See, e.g.*, Record No. 39.]  However, at trial, Sosa spelled her name "Brizeida Janett Sosa."  [Record No. 333, p. 126]

And as Martinez's role in the cartel grew, so did the scope of his money laundering operation. He sent some of the drug proceeds he collected back to the cartel by means of bulk cash smuggling, *i.e.*, by delivering the money in bulk to individuals who intended to transport it to Mexico. Martinez was observed delivering approximately $990,000 to an undercover agent, $575,000 to Defendant Rene Ramos Campos, and $298,000 to Defendant Aldo Fletes Lopez for this purpose. [*Id.* at 13-33, 149] He also delivered a money counter to an individual that was found in possession of approximately $302,000 in drug money at his home. [*Id.* at 31-33]

Martinez laundered the rest of the money, with the help of others, by means of bank deposits and wire transfers. In this regard, he asked his wife, Brizeida Sosa, to deposit approximately $7,000 to $12,000 at a time into her personal bank account, and then to wire the money to accounts in China (a major source of fentanyl distribution) using information provided by Jalisco. [*Id.* at 40, 129-30]

However, there are various reporting requirements associated with making large cash deposits. Banks are required to file a Currency Transaction Report when an individual makes a cash deposit exceeding $10,000. [*Id.* at 82] Banks also file a Suspicious Activity Reports when they notice suspicious activity concerning an account. [*Id.* at 83] For example, when a bank "start[s] seeing large cash deposits going in [an individual's account] and being wired out to different countries or even to other individuals that have no previous relationship to that individual, [it] could deem that suspicious and create a report." [*Id.*]

Brizeida Sosa was making approximately $200 per week working as a waitress at the time that she began making cash deposits of $7,000 to $12,000 into her personal bank account.

[*Id.* at 133]  Martinez was making approximately $800 per week working at horse farm.  [*Id.* at 155]  Given the size of the deposits and the couple's limited means, Sosa thought it was "obvious" that the money was not coming from a legitimate source, and "figured out it was drug money." [*Id.* at 129, 131]  The bank likewise found Sosa's banking activity to be suspicious.  [*Id.* at 130-33]  Her deposits triggered the reporting requirements associated with large cash transactions, and her personal banking account was closed.  [*Id.*]

This led Sosa and Martinez to find other ways to launder the ever-increasing drug proceeds.  Sosa asked another waitress at the restaurant she worked at, Defendant Laura Lisa Ortiz, to help her make the deposits.  [*Id.* at 133]  Sosa paid Ortiz $200 to deposit approximately $15,000 of drug money into Ortiz's personal bank account and then wire it to an account in China using information provided by Jalisco.  [*Id.* at 133-34; Record No. 334, pp. 80-83]  However, Ortiz's bank soon became suspicious of the activity on her account as well.  [*Id.* at 135]

Ortiz told Sosa that her sister, Defendant Smirna Ortiz, also had a bank account and "wanted to make extra cash."  [*Id.*]  Sosa agreed to bring on Smirna Ortiz and gave her large amounts of drug money, directions to deposit the money into her personal baking account and wire it to specified accounts, and instructions not to appear nervous or suspicious at the bank. [*Id.* at 135-37; Record No. 334, pp. 55, 101]  Smirna Ortiz made cash deposits of $7,020 and $10,000 into her personal account and wired the money to accounts in China.  [Record No. 333, pp. 93-95, 135]  The testimony was inconsistent regarding whether she was paid for making these deposits.  [*Compare id.* at 135, *with* Record No. 334, p. 58-59.]  It is also

unclear whether the $10,000 cash deposit into Smirna Ortiz's personal banking account triggered a Currency Transaction Report. [Record No. 333, pp. 94-95]

In any event, the defendants soon stopped using their personal accounts to launder the money. Instead, they began depositing the money directly into accounts associated with the cartel at bank branches located outside of the state. The conspirators developed the following system. Jalisco would call Martinez and Sosa the night before a depositing trip and provide them with the bank name, account number, account holder name, and dollar amount of the deposits they were to make. [*Id.* at 130-32, 137-38, 141; Record No. 334, pp. 12-13] Sosa would then take out a large box of drug proceeds that she and Martinez kept in their bedroom, count out the amount of cash needed for each deposit, rubber band the deposits together, and place a sticky note on each deposit with the information need to execute it: the bank name, account number, name of the account holder, and amount to be deposited. [Record No. 333, pp. 27, 37-47, 68, 72, 95-100, 112, 124, 137-47; Record No. 334, pp. 13-17, 32-40, 47, 93]

The money would then be divided between Brizeida Sosa, her sister Defendant Arlenne Sosa, Laura Lisa Ortiz, and Smirna Ortiz, who were paid to travel out of state (initially to Tennessee) to make the deposits. [*See* Record No. 333, pp. 37-47, 111-20, 133, 136-47, 143-44, 150; Record No. 334, pp. 32-40, 47-48, 56-62, 82-100.] They took an average of $70,000 to $100,000 in cash per trip and used their own identification to make the deposits. [Record No. 333, pp. 47, 102-04, 109, 139, 144; Record No. 334, pp. 33-37, 85] Once they arrived in a city, they would spread the deposits among several bank branches, never making a deposit exceeding $10,000. [Record No. 333, pp. 43-47, 54-55, 95-98, 100, 113-21, 137-40; Record No. 334, pp. 41-42, 48, 84, 99] That way, the conspirators making the trip could avoid the

reporting requirements associated with large cash transactions. [*See* Record No. 333, pp. 82-84, 98, 100; Record No. 334, pp. 42, 48.]

Eventually, the defendants became concerned with the identification requirements at Tennessee banks, and Laura Lisa Ortiz and Smirna Ortiz suggested making the trips to North Carolina (where they grew up) because the identification requirements there were more relaxed. [Record No. 333, pp. 138-39; Record No. 334, pp. 43, 45, 90-91] Laura Lisa Ortiz was traffic stopped while on her way back from a depositing trip in North Carolina on November 4, 2016, and receipts from the deposits she had made were seized from her vehicle. She became scared and quit making deposits at that point. [Record No. 333, pp. 44-45, 80, 101, 142; Record No. 334, pp. 43-45, 96-100] However, Smirna Ortiz and the other defendants continued with the scheme.

The defendants were arrested and charged with various money laundering and drug distribution counts following a lengthy investigation by the government. [Record No. 73] Defendants Martinez and Brizeida Sosa pleaded guilty to conspiracy to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 846 and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(ii) and (h). [Record Nos. 265, 266, 291, 292] Defendants Aldo Ivan Fletes-Lopez, Rene Ramos Campos, Arlenne Sosa, and Laura Lisa Ortiz pleaded guilty to conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(ii) and (h). [Record Nos. 87, 88, 96, 97, 311, 313, 314] Defendant Smirna Ortiz pleaded not guilty to conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(ii) and (h), and proceeded to trial.

At trial, Brizeida Sosa testified that Smirna Ortiz was at Sosa and Martinez's home while the money was prepared for the depositing trips. [Record No. 333, pp. 142, 144-45] Over $2 million in drug money passed through the house, and Ortiz would have seen as much as $250,000 at a time while the money was counted. [*Id.* at 142, 144] Sosa also testified that she went on around three trips with Smirna Ortiz to deposit drug money. [*Id.* at 150] She stated that Ortiz did not want to go on the trips unless a substantial amount of money was being deposited (because the more the defendants deposited, the more they got paid), and that Ortiz was nervous on the trips. [*Id.* at 139, 150] Sosa instructed Ortiz not to act nervously or suspiciously, and to have a cover story prepared in case she was asked any questions about the source of the money or the deposits. [*Id.* at 136-38] Brizeida Sosa also testified that on one occasion, Smirna and Laura Lisa Ortiz were admiring a new Chevy Tahoe that Martinez had acquired, and Sosa "told them that [Martinez] got a nicer truck because he was dealing with the drugs, you know, he was taking a bigger risk than us with the money." [*Id.* at 153]

Arlenne Sosa testified that she was paid to go on approximately five depositing trips with Smirna Ortiz. They deposited approximately $70,000 to $100,000 in drug money each time. [Record No. 334, pp. 33, 36-37, 43-46] Arlenne Sosa saw around $100,000 being counted at Brizeida Sosa and Martinez's home in preparation for the trips. [*Id.* at 35] Although she initially thought the money was from a legitimate source, she knew that Brizeida Sosa and Martinez did not have that kind of money from legitimate employment, and later assumed the money was from some kind of illegal activity. [*Id.* at 33, 35] Arlenne Sosa did not recall having any specific plan if they were asked about the cash they were depositing, but she understood that part of the reason for depositing the money in increments under $10,000

was to prevent questions from being asked. [*Id.* at 41-42] Her understanding, based on what Brizeida Sosa told her, was that "I guess, you have to prove when it's like over $10,000." [*Id.* at 42] However, Arlenne Sosa testified that she did not personally make sure the amounts were under $10,000; she simply deposited the amounts that Brizeida Sosa provided to her, which were always less than $10,000. [*Id.*]

Laura Lisa Ortiz testified that she was paid to go on approximately three or four trips with Smirna Ortiz and they deposited approximately $100,000 each time. [*Id.* at 85-86] When asked if she knew the source of the money, Laura Lisa Ortiz responded: "I'm not a dumb person. Large amounts of money that come in from two individuals that cannot afford that much money, it's obvious." [*Id.* at 85] She also understood that the individual deposit amounts were not to exceed $10,000, but she did not know why. [*Id.* at 84] She testified that she and Smirna Ortiz were both present while the $100,000 for their depositing trips was being counted out of a larger box of cash. [*Id.* at 92-94] She also testified that Smirna Ortiz was present on a trip when Brizeida Sosa purchased a money counter to aid in the preparation. [*Id.*] Laura Lisa Ortiz stated that the money smelled like drugs, likely because Brizeida Sosa frequently smoked marijuana in the home. [*Id.* at 89]

Drug Enforcement Administration ("DEA") Task Force Officer Scott McIntosh testified that he arrested and interviewed Smirna Ortiz on April 13, 2017. [*Id.* at 54-55] During the interview, Smirna Ortiz admitted to making a $10,000 deposit into her personal banking account at Brizeida Sosa's behest and sending the money to a person she did not know. [*Id.* at 57-59, 61] Smirna Ortiz also admitted to being paid $400 plus expenses to go on multiple depositing trips with Brizeida and Arlenne Sosa. [*Id.* at 59-62] When asked about

the source of the money, Smirna Ortiz responded "[t]hat she just knew that something wasn't right, or she felt like something wasn't right." [*Id.* at 62]

At the close of the government's evidence and again after the close of all evidence, Defendant Smirna Ortiz moved for a judgment of acquittal. Both motions were denied. The jury found her guilty of conspiracy to commit money laundering on July 17, 2018. [Record No. 326] Defendant Smirna Ortiz then filed a renewed motion for a judgment of acquittal, which is pending for consideration. [Record No. 335] The motion will be denied for the reasons that follow.

## II.

Rule 29 of the Federal Rules of Criminal Procedure authorizes a defendant to file a motion for acquittal challenging the sufficiency of the evidence after a jury verdict. However, "[a] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (quotation omitted). The Court's inquiry is limited to "whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In conducting this inquiry, the Court must view the evidence in the light most favorable to the prosecution, "giving the prosecution the benefit of all reasonable inferences from the testimony." *Graham*, 622 F.3d at 448 (quotation omitted). And the Court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *Id.*

"Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. The jury may draw any

reasonable inferences from direct, as well as circumstantial, proof." *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000).

## III.

To sustain a conviction for conspiracy to launder money in violation of 18 U.S.C. § 1956(h), government must prove that the defendant "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment." *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006). The elements of the substantive provisions at issue here require that the defendant: (i) conducted a financial transaction; (ii) involving drug proceeds; (iii) knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity; and (iv) knowing that the transaction was designed in whole or in part to avoid a transaction reporting requirement under state or federal law. *See* Jury Instruction No. 14.

The defendant does not contest that she conducted financial transactions involving drug proceeds. But she contends that there was insufficient evidence for the jury to find that she knew that the property involved in the transactions represented drug proceeds or that the transactions were designed in whole or in part to avoid a transaction reporting requirement under state or federal law. [*See* Record No. 335-1, pp. 2-3] The defendant also suggests that there was insufficient evidence for the jury to find that she knowingly and voluntarily joined the conspiracy intending to help advance or achieve its goals. [*Id.*]

"The 'knowledge prong[s]' of the money laundering statute can be proven by direct or circumstantial evidence." *United States v. Johnson*, 26 F. App'x 441, 446 (6th Cir. 2001). But there is ordinarily "no way that a defendant's state of mind can be proved directly,

because no one can read another person's mind and tell what that person is thinking." Jury Instruction No. 12. As a result, "[p]roof of knowledge . . . is rarely established by direct evidence." *United States v. Scruggs*, 549 F.2d 1097, 1104 (6th Cir. 1997). Instead, the Sixth Circuit has long recognized that "circumstantial evidence [and] independent facts from which an inference of the ultimate fact to be established may rationally be drawn in light of common experience can be sufficient to support a jury's determination that a defendant had guilty knowledge beyond a reasonable doubt." *Id.*

Further, "[n]o one can avoid responsibility for a crime by deliberately ignoring the obvious." Jury Instruction No. 12. The jury was permitted to find that the defendant had the requisite knowledge if it was convinced beyond a reasonable doubt that she was aware of a high probability that the property involved in the financial transactions represented drug proceeds and that the financial transactions were designed, in whole or in part, to avoid a transaction reporting requirement, but deliberately closed her eyes to what was obvious. *Id.*

To show that the defendant knowingly and intentionally joined the conspiracy, the government was not required to prove "that the defendant knew everything about the conspiracy, or everyone else involved, or that she was a member of it from the beginning." Jury Instruction No. 14. Nor was it required to prove "that the defendant played a major role in the conspiracy, or that her connection to it was substantial." *Id.* And it was permitted to indirectly prove the defendant's knowledge "by facts and circumstances which lead to a conclusion that [the defendant] knew the conspiracy's main purpose." *Id.*

Here, a rational trier of fact could have found beyond a reasonable doubt that Smirna Ortiz knew that the financial transactions she made involved property that "represent[ed] the

proceeds of some form of unlawful activity." Jury Instruction No. 14. There was direct evidence to this effect. DEA Task Force Officer Scott McIntosh testified that when he asked Smirna Ortiz about the source of the money used to make the deposits, she responded "[t]hat she just knew that something wasn't right, or she felt like something wasn't right." [Record No. 334, p. 62] And Defendant Brizeida Sosa testified that she told Smirna Ortiz that "[Martinez] got a nicer truck because he was dealing with the drugs, you know, he was taking a bigger risk than us with the money." [Record No. 333, p. 153]

The defendant argues that Brizeida Sosa's testimony should be discounted for several reasons. First, she contends that because "the government's proof of Smirna's knowledge rests solely on the unsupported testimony of co-defendant Sosa . . . the evidence is not sufficient to sustain the conviction." [Record No. 335-1, p. 14] This argument is erroneous. First, it is simply not true that the government's proof rested "solely" on this evidence. But even if it did, a judgment of acquittal would not be warranted. Contrary to the defendant's argument, "it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *Graham*, 622 F.3d at 448 (quotation omitted).

The defendant also argues that Brizeida Sosa's testimony should be discounted because it conflicted with the testimony of the other co-defendants, was more expansive than the statements she gave to law enforcement officers prior to trial, and she hoped that her testimony might result in a reduced sentence. [Record No. 335-1, pp. 15-18] However, "[a] defendant's attempt to attack witness credibility simply challenges the quality of the government's evidence and not the sufficiency of the evidence." *Graham*, 622 F.3d at 449 (quotation omitted; alterations added and adopted). The Court "may not rule on a challenge

to witness credibility in reviewing the denial of a motion for acquittal because doing so would invade the province of the jury as the sole finder of fact in a jury trial." *Id.* (quotations omitted). The jury was instructed to treat Brizeida Sosa's testimony with caution, and it heard all of the contrary evidence on which the defendant relies. *See* Jury Instruction No. 22. It is not the Court's place to re-weigh that evidence here.

Additionally, there is an overwhelming amount of circumstantial evidence from which a rational juror could conclude beyond a reasonable doubt that Smirna Ortiz knew that the financial transactions she made involved proceeds of some form of unlawful activity. There was testimony that Smirna Ortiz was present in the home of Ciro Macias Martinez and Brizeida Sosa (who had a combined weekly income of approximately $1,000) while as much as $250,000 in cash was being counted in preparation for the depositing trips. [Record No. 333, pp. 133, 142, 144, 155; Record No. 334, pp. 92-94] The money literally smelled like drugs, and controlled substances were being used in the home. [Record No. 334, p. 89] And Smirna Ortiz was being paid to travel out of state with multiple co-defendants to deposit the money into accounts she was not familiar with at multiple bank branches. [*See* Record No. 333, pp. 37-47, 111-20, 133, 136-47, 143-44, 150; Record No. 334, pp. 32-40, 47-48, 56-62, 82-100.] Her co-defendants testified that it was "obvious" to them that the money came from some form of unlawful activity. [*Id.* at 85; *see also id.* at 33, 35.] A rational trier of fact could have found that Smirna Ortiz similarly knew that the money came from unlawful activity, or that she deliberately closed her eyes to what was obvious.

Next, there was sufficient circumstantial evidence for the jury to conclude beyond a reasonable doubt that Smirna Ortiz knew that the cash deposits—which were made by the

defendants on trips out of state and never exceeded $10,000—were designed to avoid a transaction reporting requirement under state or federal law. Defendant Brizeida Sosa testified that the defendants had problems when they deposited more than $10,000 in cash into her personal bank account and Laura Lisa Ortiz's bank account. [Record No. 333, pp. 130-33, 135] Arlenne Sosa and Laura Lisa Ortiz, whose involvement in the conspiracy was similar to Smirna Ortiz's, both testified that they knew that the deposits were not to exceed $10,000. [Record No. 334, pp. 41-42, 48, 84, 99] Further, Arlenne Sosa testified that Brizeida Sosa told her that the reason for this was that "you have to prove when it's like over $10,000." [*Id.* at 41-42] Although Arlenne Sosa did not personally make sure that the deposits were less than $10,000, she knew that "the money was supposed to be less than $10,000," and understood that this would prevent bank tellers and others from asking questions about the deposits. [*Id.*] Internal Revenue Service Special Agent Crystal Centers also testified that in her opinion the activity in this case, much of which Smirna Ortiz was personally involved with, was consistent with structuring deposits. [Record No. 333, p. 100]

Further, there was testimony that Laura Lisa Ortiz quit the conspiracy because she became scared when law enforcement officers recovered receipts of the deposits from her vehicle during a traffic stop. [Record No. 333, pp. 44-45, 80, 101, 142; Record No. 334, pp. 43-45, 96-100] And there was testimony that the defendants took steps to avoid detection, were instructed not to act suspiciously, and that Smirna Ortiz became nervous on the trips. [*Id.* at 136-37, 139, 150; Record No. 334, pp. 55, 101] A rational juror could have concluded beyond a reasonable doubt from all of this that Smirna Ortiz, like her co-defendants, knew that

the financial transactions she conducted were designed to avoid the requirements imposed by law, or deliberately closed her eyes to what was obvious.

Finally, there was ample evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Smirna Ortiz knowingly and voluntarily joined a conspiracy to launder money. "The government is not required to prove participation in a conspiracy through direct evidence, but may suggest the inference that a common purpose existed based upon circumstantial evidence. In addition, it is not necessary to show that the defendant knew the full extent of the enterprise to sustain a conspiracy conviction." *Johnson*, 26 F. App'x at 445 (citations omitted). Here, the evidence that the defendant observed a large amount of cash being prepared for structured deposits and traveled out of state to deposit the money into accounts with which she was not familiar, combined with her co-defendants' testimony that they knew of the source of the money and the purpose of the structured deposits, was sufficient for a rational juror to conclude beyond a reasonable doubt that Smirna Ortiz voluntarily joined that conspiracy knowing of its main purpose. The fact that she may not have known the full extent of the conspiracy -- or the fact that she may not have played as large of a role in it as some of her co-defendants -- is an insufficient reason to set her conviction aside.

## IV.

For the foregoing reasons, it is hereby

**ORDERED** that Defendant Smirna Ortiz's renewed motion for judgment of acquittal [Record No. 335] is **DENIED**.

Dated:   August 16, 2018.

 Signed By: *Danny C. Reeves*
United States District Judge